**SIGNED THIS: September 10, 2019**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 17-70853 |
| EVERETT E. GRADY and | ) | |
| KATHRYN E. GRADY, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| MICHAEL MEYER, MEYER | ) | |
| TECHNOLOGY SOLUTIONS, LLC, | ) | |
| CHRISTOPHER MEYER, MEYER | ) | |
| CAPITAL GROUP, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 17-07043 |
| | ) | |
| EVERETT E. GRADY and | ) | |
| KATHRYN E. GRADY, | ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

Before the Court after trial is a complaint objecting to the Debtors' discharges. For the reasons set forth herein, judgment will be entered against the Debtors and their discharges will be denied.

## I. Factual and Procedural Background

Everett E. Grady and Kathryn E. Grady ("Debtors") filed their voluntary petition under Chapter 7 on May 24, 2017. On their schedules, they listed ownership of an 88% interest in Kaegem Corporation ("Kaegem") valued at zero and a potential sale of "partially developed software" by Kaegem to ProHub, Inc., ("ProHub") for an unknown amount. They scheduled debts to Michael Meyer in the amount of $75,000, Meyer Technology Solutions, LLC ("Meyer Technology") for $115,619.22, Christopher Meyer for $25,000, and Meyer Capital Group ("Meyer Capital") for $50,000. All of those debts were listed as business debts that were not subject to setoff and were undisputed. Nevertheless, the Debtors also disclosed their involvement in pending litigation with the Meyer individuals and entities and scheduled a potential claim with unknown value against Michael Meyer and Meyer Technology.

On their Statement of Financial Affairs ("SOFA"), in response to a question regarding either ownership or involvement as an officer or director in a business, the Debtors listed both Kaegem and ProHub. With respect to Kaegem, the Debtors described the business as "performing employee background checks" and said that the business began in 2012 and was continuing to operate. ProHub was listed with an address in care of a Delaware law firm and was described as a business that began operating in "2/2017" and was "preparing to conduct

compliance verification." No ownership interest in ProHub was scheduled, but disclosure was made that "Debtor is on board of directors."

Michael Meyer, Christopher Meyer, Meyer Technology, and Meyer Capital (collectively "the Meyers") timely filed their adversary complaint seeking to deny the Debtors their discharges or, alternatively, requesting that any debt owed by the Debtors to the Meyers be excepted from the Debtors' discharges. In their complaint, the Meyers allege that Kaegem was incorporated in 2012 by the Debtors and that both Debtors were, at all relevant times, both officers and directors of Kaegem. They also allege that Kathryn Grady is the owner of 88% of Kaegem's stock. Kaegem was described as a company that "sold compliance management software in order to perform employee background checks, driver's license checks, and the like." They claim that Meyer Technology assisted the Debtors and Kaegem in the development of the software. The Meyers allege that, when the Debtors and Kaegem had trouble paying Meyer Technoloy for its work, a series of transactions occurred whereby Michael Meyer and Meyer Technology received Kaegem stock in partial payment for work done. Subsequently, through another series of transactions, all of the Meyers became shareholders of Kaegem.

The Meyers claim that, in 2014, they began to have questions about the financial condition of Kaegem and concerns about whether some of the affirmative representations that had been made to them when they acquired Kaegem stock were accurate. They allege that their investigation established that a representation made by the Debtors that they had personally invested $1.5 million in Kaegem was false and that, despite representations to the contrary, the Debtors had been taking significant distributions from the company. Meyer Technology

and Michael Meyer stopped work on the Kaegem software, and, in 2017, the Meyers filed a lawsuit against the Debtors for breach of fiduciary duty, common law fraud, unjust enrichment, and violations of the Illinois Business Corporation Act. Several months after the lawsuit was filed, the Debtors filed their bankruptcy case.

In their counts seeking to have the Debtors discharges denied, the Meyers allege that the Debtors made false statements in their petition, at their creditors meeting, and at subsequent examinations taken pursuant to Bankruptcy Rule 2004. They also allege that the Debtors concealed assets and refused to comply with court orders regarding the production of documents. Kathryn Grady is accused of violating the court order regarding the scheduling of her Bankruptcy Rule 2004 examination ("2004 examination").[1]

Although the Debtors were represented by counsel in the filing of their bankruptcy, they represented themselves in this adversary proceeding. They filed an answer denying many of the allegations of the complaint. After a significant period of discovery, the counts seeking denial of discharge were tried. The only witnesses called at trial were the Debtors.

Everett Grady, called as a witness by the Meyers, testified that he incorporated Kaegem in 2012 as a business to develop compliance software. He said he had an ownership interest in Kaegem but then clarified that his wife

---

[1] In their count seeking to except debts owed to them from any discharge the Debtors might receive, the Meyers allege that the Debtors made materially false statements about Kaegem's financial condition and the Debtors' equity contributions to Kaegem in a written, private placement memo tendered by the Debtors to the Meyers to solicit the Meyers' purchase of Kaegem stock. That count was not tried with the objection to discharge counts and remains pending.

Kathryn actually owned 88% of Kaegem's stock. He testified that, over the years, both he and Kathryn have served in various positions as corporate officers; he described himself as being in charge with Kathryn playing a more limited role in the business operation.

Much of Mr. Grady's testimony focused on ProHub. He admitted that the reference to one of the Debtors being on the board of directors of ProHub in their SOFA was not true. He acknowledged that he had retained an attorney in Delaware to incorporate ProHub but that, after the incorporation, no shares had been issued and, accordingly, ProHub had no shareholders and no board of directors.

Mr. Grady admitted that, when asked about whether Kaegem and ProHub were his businesses at his creditors meeting conducted by James Inghram, the Chapter 7 trustee ("Trustee"), he denied that ProHub was his business, stating affirmatively that "[i]t is not." The Trustee had also inquired about the proposed sale of Kaegem's software to ProHub and asked Mr. Grady if a valuation had been discussed. Mr. Grady told the Trustee that Kaegem was going to receive a 15% royalty over a ten-year period and denied that any up-front payment would be received.

The Meyers' attorney had also questioned Mr. Grady at the creditors meeting, and, at trial, Mr. Grady admitted that, when asked which of the Debtors was on the board of directors of ProHub, he said that he had asked to be on the board but "[i]t hasn't been granted because we don't have a signed agreement yet." When asked at the creditors meeting who the shareholders of ProHub were, Mr. Grady said that he did not know and offered that "I've been dealing with their legal

counsel and a project manager." When asked who the legal counsel for ProHub was, Mr. Grady said he would have to get that information. And, when asked who the project manager was, he named "Wade Osborne." Further, Mr. Grady said that he had been looking for investors or venture capital and that, after reaching out to a number of people, he had been "approached by the legal counsel" of ProHub.

Mr. Grady admitted that, near the conclusion of the creditors meeting, the Trustee had again asked about the potential software sale to ProHub, summarizing what he had heard: "[Y]ou approached the people, employees of ProHub, about selling the software to ProHub. Correct?" Mr. Grady acknowledged that he had answered: "Correct." Mr. Grady also admitted telling the Trustee that, referring to ProHub, he had reached out to "them" to make a cash sale but "they" would not agree.

After acknowledging that he had given the above testimony at the creditors meeting, Mr. Grady admitted that he knew ProHub had no shareholders or employees, that the "they" he had referred to was himself, and that "their legal counsel" was really his own legal counsel. He provided no explanation for the repeated misrepresentations other than to say that he "mispoke."

Mr. Grady also admitted that he and his wife had been ordered to attend a 2004 examination requested by the Meyers and that his examination had occurred September 21, 2017. He agreed that, when asked at the 2004 examination about being approached by ProHub's legal counsel as he had testified at the creditors meeting, he said that he actually had been given the attorney's name and had reached out to her. He also admitted saying that the attorney had told him that she represented ProHub and that he had not asked her who the

shareholders of ProHub were because he was just trying to "have an initial conversation." At the 2004 exam, Mr. Grady said again that he did not know who the shareholders of ProHub were but finally—after repeated questioning—admitted that he had incorporated ProHub through the Delaware attorney.

Mr. Grady admitted at trial that the order directing the Debtors to appear at the 2004 examinations also required them to produce a number of documents and that he had not produced all of the requested documents. Instead, he filed a response indicating that many of the documents did not exist. Nevertheless, he admitted during the 2004 examination, and again at trial, that he had a corporate book for ProHub and some records regarding the incorporation of ProHub that should have been produced. At trial, he also identified a three-page document consisting of  minutes of Kaegem board of directors meetings held February 10, 2017, and September 27, 2017. He admitted that he had not produced the minutes of the February meeting at his 2004 examination and that none of the Kaegem minutes had been produced until a deposition on March 15, 2019.

In reviewing the first page of the minutes that Mr. Grady acknowledged were from the February 10, 2017, meeting, Mr. Grady admitted that the minutes disclose a plan to sell the assets of Kaegem through the development of a new corporation. The purpose of the sale would be to fund the litigation with the Meyers that had just been commenced in January 2017. Mr. Grady admitted that the plan was to avoid paying Kaegem's creditors, including the Meyers, and that the idea to create the new corporation had come from the Debtors' bankruptcy attorney, Eric Ostling. Mr. Grady said that Attorney Ostling represented the Debtors personally but also counseled them regarding Kaegem and ProHub. Mr.

Grady acknowledged that he was aware that transferring the software from Kaegem to ProHub would diminish the value of Kaegem and admitted that the plan to transfer the software was not discussed with the other shareholders of Kaegem, including the Meyers.[2]

According to Mr. Grady, the last two pages of the minutes related to the meeting held September 27, 2017. Those minutes included a notation that the Trustee had determined that neither the Kaegem stock nor the software had any value for him to administer and had declared the case "no asset." The minutes reflect the opinion—apparently of Mr. Grady—that, based on the Trustee's action, "ProHub is clear to begin developing revenue."

Mr. Grady was also questioned about his involvement in a not-for-profit corporation know as A Patriot's Home. He admitted that he had created the entity in 2016 and that its purpose was to provide housing to veterans. He agreed that the entity was operational when the bankruptcy was filed and that he was on the board of directors at the time but did not list his involvement in the entity on his schedules or SOFA.

Mr. Grady concluded his initial testimony by admitting that he had not disclosed on his schedules or other bankruptcy documents that Kaegem owed the Debtors money or that the Debtors had been receiving payments from Kaegem on the loans they had made to the company. The Debtors also admittedly failed to disclose the sale of a vehicle and the short sale of their home. Mr. Grady justified the omissions by suggesting that the debt owed to them by Kaegem and the debt

---

[2] Mr. Grady identified a 2014 balance sheet for Kaegem that valued the software at $5 million. He admitted that he had prepared the spreadsheet.

they owed to the mortgage lender related to their home sale had been written off.

Kathryn Grady also was called as a witness by the Meyers at trial. She said that she owned 88% of the Kaegem stock and that she had served for several years as president of Kaegem. She agreed that she had served on Kaegem's board of directors and had also held the office of corporate secretary. She denied having any particular knowledge about the creation or existence of ProHub.

Mrs. Grady admitted that she had seen the notice scheduling her 2004 examination and that she had been informed by her bankruptcy attorney that her examination had been scheduled for September 21, 2017. She acknowledged that she failed to appear for the scheduled examination. Mrs. Grady also admitted that she was aware of the order entered August 17, 2017, that required her to produce documents to the Meyers' attorneys within twenty-eight days after the entry of the order. She acknowledged that she did not produce any documents and that she did not look for documents, inquire of her husband where responsive documents might be, or inquire whether he was complying with his identical obligation to produce documents. She admitted that she made no effort whatsoever to determine if her husband had produced any documents responsive to the order.

At the conclusion of the Meyers' case, Mr. Grady testified again on his own behalf. He explained the development of the Kaegem software and provided some history of the business. He said that his involvement with A Patriot's Home was not scheduled because he did not receive income from the not-for-profit and the entity had no assets. He also said that, with respect to ProHub, he felt that, by listing it as they had, the Debtors were telling the Trustee that it existed.

Mr. Grady attempted to introduce into evidence a document that he

described as a timeline, consisting largely of his own notes and recollections
regarding his dealings with the Meyers. When the Meyers' attorney's objection to
the introduction of the document into evidence was sustained, Mr. Grady became
flustered and hesitant to proceed. At that point, Mrs. Grady interjected that she
wanted the opportunity to examine Mr. Grady. But after a brief recess was taken
to give the Debtors an opportunity to consult on how they wanted to proceed, both
Debtors said that they had no further testimony or evidence to present.

The Meyers' attorney and Mr. Grady presented closing arguments. The
matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C.
§1334. All bankruptcy cases and proceedings filed in the Central District of Illinois
have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C.
§157(a). Objections to discharge are core proceedings. 28 U.S.C. §157(b)(2)(J). This
matter arises from the Debtors' bankruptcy itself and from the provisions of the
Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy
judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

One goal of the Bankruptcy Code is to provide a fresh start to debtors.
*Grogan v. Garner*, 498 U.S. 279, 286 (1991). Accordingly, debtors may be afforded
the privilege of a discharge. *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011).
Discharges are reserved, however, for the "honest but unfortunate debtor." *Id.*

Likewise, the privilege of a discharge may be denied to a dishonest debtor. *See* 11
U.S.C. §727(a). A plaintiff bears the burden of proof by a preponderance of the
evidence in an action to deny a debtor a discharge. *In re Kempff*, 847 F.3d 444,
447 (7th Cir. 2017). In this case, the Meyers seek to have the Debtors' discharge
denied under several separate and distinct legal theories. Each will be analyzed
separately.

### A. Count I: Section 727(a)(4)(A) – False Oath

A debtor will be denied a discharge if such debtor "knowingly and
fraudulently, in or in connection with the case . . . made a false oath or account[.]"
11 U.S.C. §727(a)(4)(A). To deny a debtor's discharge under §727(a)(4)(A), the
objecting party must prove that: "(1) the debtor made a statement under oath; (2)
the statement was false; (3) the debtor knew the statement was false; (4) the
debtor made the statement with fraudulent intent; and (5) the statement related
materially to the bankruptcy case. *Stamat*, 635 F.3d at 978. Each element must
be proven by a preponderance of the evidence. *Id.*

For purposes of §727(a)(4)(A), statements made at a meeting of creditors, a
2004 examination, or on a debtor's petition, schedules, or statement of financial
affairs are considered statements made under oath. *Spohn v. Carney (In re
Carney)*, 558 B.R. 250, 260 (Bankr. N.D. Ill. 2016). A false statement includes
omissions of information required to be disclosed. *BMO Harris Bank N.A. v. Brahos
(In re Brahos)*, 589 B.R. 381, 396 (Bankr. N.D. Ill. 2018).

The most significant allegation of a false oath made in this case relates to
Mr. Grady's testimony regarding ProHub. In the Debtors' SOFA, they disclosed

-11-

that one of them was on ProHub's board of directors. That statement was made under oath but was not true. At trial, Mr. Grady admitted as much and confirmed that, at the time, no shares of ProHub had been issued and no shareholders or board of directors therefore existed. Mr. Grady says that, by making the disclosure, albeit an inaccurate disclosure, he and his wife alerted the Trustee and creditors to the existence of ProHub and thereby fulfilled their duty of disclosure. To some extent, that could have been true. The Trustee and creditors were actually alerted to the existence of ProHub and put on inquiry notice to question the Debtors about ProHub. The problem for Mr. Grady, however, is that, having given notice to the Trustee and creditors to ask questions, he then outright lied to the Trustee and to the Meyers' counsel in response to those questions.

When asked by the Trustee at the creditors meeting whether ProHub was his business, Mr. Grady said, "It is not." That was not true; as the sole incorporator of ProHub, he controlled the business. When asked by the Trustee about the potential sale of software to ProHub, Mr. Grady repeatedly used terms such as "they" and "them" to suggest that he was talking to third parties who were representing ProHub. The use of such words was false and misleading; there was no "they" or "them." Likewise, his statement to the Trustee that he had asked "them" to make a cash sale, but "they" would not agree, was pure fiction. Mr. Grady was negotiating, if at all, with himself.

Mr. Grady said that he had been dealing with ProHub's legal counsel who had approached him after he put the word out that Kaegem was trying to sell its software. But, as he had to admit at trial, that was also not true. He had hired a Delaware attorney to incorporate ProHub for him, and she was his attorney

throughout the process. He said that Wade Osborne was ProHub's project manager, but, again, that was not true. Mr. Osborne was a friend and former work colleague of Mr. Grady and had been asked by Mr. Grady to become involved in the software development; he did not work for ProHub. Finally, when the Trustee summed up the creditors meeting discussion by saying: "[Y]ou approached the people, employees of ProHub, about selling the software to ProHub. Correct?" Mr. Grady replied: "Correct."

When confronted at trial with all of the lies he had told at the creditors meeting, Mr. Grady said that he mispoke. But that was simply another lie. He did not just misstate a fact or two at the meeting; he wove an involved narrative in an effort to convince the Trustee that ProHub was an unrelated entity with which he was conducting arms-length negotiations on behalf of Kaegem. And Mr. Grady admitted at trial that he continued the false narrative while under oath at his 2004 examination. Only after repeated questioning by the Meyers' attorney did he finally admit that he was the incorporator of ProHub.

All of the false statements were made by Mr. Grady while under oath. He knew that they were false; he had actual knowledge that he was ProHub's incorporator and ProHub did not have any employees, shareholders, or directors. He knew that the legal counsel for ProHub that he made reference to was his own attorney. Mr. Grady's fraudulent intent in making the false statements may be inferred from circumstantial evidence; his repeated false statements about a variety of matters involving ProHub establish a pattern of disregard for the truth that, in turn, confirms his fraudulent intent. *Carney*, 558 B.R. at 260 (citations omitted); *Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 872 (Bankr. C.D. Ill.

-13-

2005) (citations omitted). There is no plausible explanation for Mr. Grady's repeated false statements other than an intent to mislead and commit fraud upon the Trustee and his creditors. He knew what he was saying was false, and he said it anyway.

Finally, Mr. Grady's false statements were material. The test for materiality is whether the false statement "bears a relationship to the bankrupt's business transactions or estate, . . . or the existence and disposition of his property." *Bensenville Community Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 162 (Bankr. N.D. Ill. 1992) (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)). Here, Mr. Grady had incorporated a new business for the express purpose of transferring the assets of Kaegem and creating at least the illusion of a sale of Kaegem's software. The value of Kaegem and its assets was important to the Trustee and the Debtors' creditors. Likewise, the potential value and purpose of the newly-created corporation were important to the Trustee and the Debtors' creditors. Although it is unclear why Mr. Grady thought his false statements were more helpful to his position than simply telling the truth, the topics were clearly related to the Trustee and creditors obtaining a full and honest understanding of the Debtors' business transactions and were therefore material.

In addition to the material misstatements about ProHub, Mr. Grady also admitted that he failed to disclose sales of a vehicle and a home. He also failed to disclose that money was owed to the Debtors by Kaegem and that the Debtors had taken distributions from Kaegem in repayment of the loan. Although he tried to justify some of the omissions, his explanations were wholly inadequate. Transfers of assets must be disclosed regardless of whether any underlying debt related to

-14-

the asset is paid as part of the transfer. Debtors are obligated to make required disclosures, and, even if a debtor thinks there could arguably be a basis to avoid disclosure, disclosure should still be made. *Clarke*, 332 B.R. at 872 (*citing Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 315-16 (Bankr. E.D.N.Y. 1991)). Although some of the non-disclosures may seem minor, the cumulative effect is problematic and further evidences Mr. Grady's disregard for the truth.[3] Because of all of his misrepresentations, Mr. Grady's discharge must be denied.

Mr. Grady's false statements, however, are not automatically imputed to Mrs. Grady. *Cole Taylor Bank v. Yonkers (In re Yonkers)*, 219 B.R. 227, 233 (Bankr. N.D. Ill. 1997). Each of the Debtors had an independent duty to disclose, and their conduct must be individually analyzed. *Id.* At trial, Mrs. Grady denied having any particular knowledge about ProHub, and she was not challenged on that assertion. She was not questioned about any of the other omissions from the Debtors' schedules or SOFA. Absent any testimony or other evidence that Mrs. Grady knew that Mr. Grady's statements regarding ProHub were false or that incorrect information was contained in their paperwork, her discharge cannot be denied for making a false oath.

The Meyers established that Everett Grady knowingly made false oaths both at his creditor meeting and at his 2004 examination, that the false statements were material, and that they were made with an intent to commit fraud on the Trustee and the Debtors' creditors. Mr. Grady's discharge must be denied on that basis. The Meyers failed to meet their burden of proof on the issue of false oaths

---

[3] The Court did not consider Mr. Grady's failure to disclose his involvement in the not-for-profit, A Patriot's Home. He had no ownership interest in the entity or its assets. Generally, such community involvements are not required to be disclosed.

with respect to Kathryn Grady, and her discharge will not be denied based on the allegations of Count I.

## B. Count II: Section 727(a)(3) – Failure to Keep Records

Under §727(a)(3) of the Bankruptcy Code, a debtor will be denied a discharge if the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" 11 U.S.C. §727(a)(3). The purpose of this provision is to ensure the complete and accurate disclosure of information concerning a debtor's financial affairs and to "test the completeness of the disclosure relevant to discharge." *Kontos v. Manevska (In re Manevska)*, 587 B.R. 517, 536 (Bankr. N.D. Ill. 2018) (citation omitted). Records need not be maintained in any special manner. *Matter of Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996). But the court and interested parties should not be required to speculate and reconstruct the debtor's affairs. *Id.*

The adequacy of the debtor's records is a question of fact and must be determined on a case by case basis. *Hunt v. O'Neal (In re O'Neal)*, 436 B.R. 545, 558 (Bankr. N.D. Ill. 2010). Factors relied on by courts in determining the adequacy of records include "the size, complexity and nature of the debtor's business; [the debtor's] educational background and level of sophistication; [the debtor's] experience and business acumen; and [the debtor's] personal financial structure." *Id.* (quoting *In re Costello*, 299 B.R. 882, 897 (Bankr. N.D. Ill. 2003)).

-16-

Fraudulent intent is not a necessary element under §727(a)(3). *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999). The objecting party has the burden to prove the inadequacies of the records. *Manevska*, 587 B.R. at 536 (citing Fed. R. Bankr. P. 4005). If the objecting party meets the burden, then the burden shifts to the debtor to demonstrate that a failure to keep records was justifiable. *Id.* at 536-37.

Here, the Meyers alleged only that the Debtors concealed records; no allegations were made that adequate records were not kept in the first place or that records were destroyed, mutilated, or falsified. At trial, the only evidence presented on the issue related to the Debtors' failure to comply with a court order requiring the production of documents at the Debtors' 2004 examinations. Although, as will be discussed in detail below, that evidence is sufficient to deny the Debtors' discharges for willful failure to comply with a court order, it was insufficient to establish by a preponderance of the evidence that the Debtors affirmatively concealed records. Absent any evidence of actual concealment, judgment on Count II will be entered in favor of the Debtors and against the Meyers.

### C. Count III: Section 727(a)(6)(A) – Refusal to Comply with Court Order

The Meyers also object to the Debtors' discharge under §727(a)(6)(A) for failure to comply with the order compelling their 2004 examinations. A debtor's discharge will be denied if "the debtor has refused, in the case . . . to obey any lawful order of the court, other than an order to respond to a material question or testify[.]" 11 U.S.C. §727(a)(6)(A). Complete compliance from a debtor concerning

-17-

a lawful court order is required to effectuate the administration of the bankruptcy case. *Grochocinski v. Eckert (In re Eckert)*, 375 B.R. 474, 480 (Bankr. N.D. Ill. 2007) (citation omitted). Courts have the discretion to determine if refusing to comply with a court order is severe enough to require denial of discharge. *Manevska*, 587 B.R. at 540 (citation omitted).

The word "refused" requires a showing of a willful or intentional act. *Eckert*, 375 B.R. at 480 (collecting cases). A mere failure to comply with a court order is insufficient to deny a debtor's discharge. *Id.* The objecting party, however, can meet its burden of proof by showing that the debtor received the order and failed to comply. *Kutrubis v. Bowman (In re Kutrubis)*, 486 B.R. 895, 901 (N.D. Ill. 2013) (citation omitted). The burden then shifts to the debtor to explain the lack of compliance. *Id.*

The Meyers allege that both Debtors failed to comply with an order entered by this Court on August 17, 2017. The order was entered after the Meyers filed a motion seeking to compel the Debtors to attend 2004 examinations and to produce documents prior to their examinations. The Debtors, through their bankruptcy attorney, objected to having to appear for the examinations, but, after a hearing, the Meyers' motion was granted. The order required both Debtors to produce the documents listed in the motion within twenty-eight days after the entry of the order. It also required both Debtors to appear for 2004 examinations at a mutually determined place, date, and time within thirty-five days after the entry of the order.

Mr. Grady testified that he received notice through his attorney that, by agreement, his 2004 examination was scheduled for September 21, 2017, at the

offices of his attorney in Bloomington, Illinois. He appeared at that time and submitted to the 2004 examination. In response to the portion of the order requiring document production, however, he denied the existence of many of the requested documents. He denied that there were any documents in existence relating to the sale of Kaegem assets to ProHub or any other entity and specifically stated in a written response that no correspondence with ProHub about a sale existed because Kaegem "could not come to terms" on the sale. At trial, Mr. Grady admitted that the production should have been made of the minutes of the February 2017 Kaegem board meeting that discussed the creation of a new corporation to buy Kaegem's software. He also agreed that the documents he had in his possession, such as the ProHub corporate book, should have been produced because such documents would have clarified what ProHub was and who owned it and thereby corrected the misrepresentations about the sale that had been made by him at the creditors meeting held several months before.

Mr. Grady's failure to produce the minutes of the February 10, 2017, Kaegem board meeting in response to the order requiring production of documents before his 2004 examination was a willful refusal to comply with a court order and justifies denial of his discharge. The minutes of the February 2017 board meeting contain specific references to and approval of the "creation of a new corporation to package" the sale of Kaegem assets. The minutes also include a notation that the value of the package to be sold would be set at $30,000. The production of the minutes would have been directly responsive to the request for documents relating to any possible sale of Kaegem assets.

Mr. Grady provided no explanation for his failure to produce the February

2017 minutes. At the time, of course, he was still maintaining the fiction that he was negotiating at arms length with an unrelated buyer—ProHub. Thus, production of the minutes would have alerted the Meyers to the fact that the Debtors and Kaegem had been involved in creating the new corporation and that much of Mr. Grady's testimony at the creditors meeting was false. Mr. Grady had to admit those facts eventually, but, when he responded to the production request, he had not yet owned up to the truth. His lack of any explanation for his admitted failure to produce required documents supports denial of his discharge.

Mrs. Grady admitted at trial that she was aware of the order requiring her to submit to a 2004 examination and to produce documents. She acknowledged that her attorney told her that her examination was scheduled for September 21, 2017, at 1:00 p.m., at his office but that she did not appear. She offered no explanation or excuse for her failure to appear.

Mrs. Grady also admitted that she did not produce any documents in response to the court order. She said that she did not look for documents and she did not ask her husband about the whereabouts of any documents. She also did not ask her husband what documents he was producing, and she did not review the documents that he did produce.  Essentially, she ignored the order and made no effort to respond to her document-production obligation. Mrs. Grady provided no explanation or excuse for her wholesale failure to even attempt to comply with the order requiring document production.

The order required Mrs. Grady to cooperate in scheduling her 2004 examination and to appear for the examination within thirty-five days of the date of the order. Mrs. Grady did neither. Although her attorney cooperated in the

scheduling of the examination, she apparently did not so cooperate and simply failed to show up despite having notice of the examination's date, time, and place. She also totally failed to comply with her obligation to produce documents; she admits that she did not even try to fulfill that obligation. Mrs. Grady offered no explanation for her failure to comply with the order. Under the circumstances, Mrs. Grady's failure to comply or even try to comply with the Court's order constitutes a willful refusal to comply sufficient to justify denial of her discharge. *Eckert*, 375 B.R. at 481; *see also Gargula v. Nave (In re Nave)*, 2015 WL 3961768, at *6 ( Bankr. C.D. Ill. June 29, 2015).

As to Count III, the Meyers met their burden of proof and the discharges of both Debtors must be denied due to their willful refusals to comply with this Court's order of August 17, 2017.

## IV. Conclusion

The discharges of both Debtors will be denied. Mr. Grady made multiple false oaths at his creditors meeting and at a subsequent 2004 examination, and he willfully refused to comply with an order of this Court. Mrs. Grady willfully refused to comply with an order of this Court.

The results here are unfortunate for the Debtors. It is not clear why Mr. Grady made the misstatements about ProHub. If he had simply told the Trustee and his creditors the truth—that he had incorporated ProHub but that ProHub had not yet issued shares and had no shareholders, directors, or assets—he could have avoided the loss of his discharge for making false oaths. And the Trustee still would have abandoned ProHub as having no value to be administered. More

importantly, the Meyers would not have had reason to so aggressively pursue the Debtors for information about ProHub, its attorney, and the prospects for an arms-length sale of Kaegem's software. If everyone knew the truth about ProHub, Mr. Grady would have had no reason not to produce the February 2017 minutes of the Kaegem board meeting, and he likely could have avoided the loss of his discharge for that misconduct.

Likewise, Mrs. Grady's refusal to comply with this Court's order is somewhat baffling. She filed a voluntary petition submitting herself to the jurisdiction of this Court. Her decision midway through the process to refuse to participate any further makes little sense. As unpleasant as sitting for an examination might have seemed to her, she knew she had been ordered to do so, and, at trial, she remained unable to offer any justification for her refusal to appear or to even attempt to comply with her document-production obligation. Had she accepted the burden of appearing, testifying, and producing documents imposed on her by the Code, Rules, and this Court, she would have received her discharge.

The Debtors made poor choices as they proceeded with their bankruptcy case. The result of those poor choices is the denial of both of their discharges. Again, the result is unfortunate but compelled by the evidence.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###